Present:   Chief Judge Decker, Judges Beales, O'Brien, AtLee, Malveaux, Athey, Fulton, Causey,
           Friedman, Chaney, Raphael, Lorish, Callins, White, Frucci and Bernhard
Argued at Richmond, Virginia

**PUBLISHED**

DIEGO CLARAMUNT

                                                            OPINION BY
v.        Record No. 1731-23-1                 JUDGE RICHARD Y. ATLEE, JR[1]
                                                         DECEMBER 30, 2025
COMMONWEALTH OF VIRGINIA

UPON A REHEARING EN BANC

FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Marjorie A. Taylor Arrington, Judge

Kristin Paulding (7 Cities Law, on brief), for appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,
Attorney General; Rachel A. Glines, Assistant Attorney General, on
brief), for appellee.

We consider in this appeal whether a preliminary protective order (PPO) that is never

served on the respondent nonetheless supersedes an existing emergency protective order (EPO).

Because the PPO statute plainly specifies that a PPO "is effective upon personal service," we

conclude that an unserved PPO does not dissolve an existing EPO.  Code § 16.1-253.1(C).

Accordingly, upon the Commonwealth's petition for rehearing en banc, we affirm Diego

Claramunt's conviction for violating an EPO under Code § 16.1-253.2.

BACKGROUND

"When presented with a sufficiency challenge in criminal cases, [appellate courts] review

the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial

---

[1] The opinion by Judge AtLee is joined by Chief Judge Decker and Judges Beales,
O'Brien, Malveaux, Fulton, and Frucci.

court." *Commonwealth v. Cady*, 300 Va. 325, 329 (2021) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)). That principle "requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom.'" *Id.* (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018) (per curiam)).

On Sunday, May 29, 2022, Claramunt's wife Adriane Claramunt drove to a magistrate's office to obtain an EPO against Claramunt. The magistrate issued the EPO at 11:30 p.m. after finding that there were reasonable grounds to believe that Claramunt had committed family abuse and posed a danger of further abuse. The EPO barred Claramunt from having any contact with Adriane or their two children. It also granted Adriane exclusive possession of the family residence and the family's companion animals. Claramunt arrived at the magistrate's office shortly after the EPO was issued, and an officer personally served him with the EPO at 12:03 a.m. on May 30, 2022. The EPO was set to expire at 11:59 p.m. on June 1, 2022.

The juvenile and domestic relations district court (JDR court) was closed on May 30, 2022, which was Memorial Day. "As soon as the court was open" on May 31, 2022, while the EPO remained in effect, Adriane went to the JDR court and obtained a PPO. Like the EPO, the PPO barred Claramunt from having any contact with Adriane or from going to the family residence. But the PPO prohibited Claramunt from having contact with his children only if the contact was "hostile." The JDR court scheduled a hearing for a final protective order but did not issue an order modifying or dissolving the EPO.

The service return sheet reflects that Claramunt was never served with the PPO. Adriane testified that Claramunt was at the JDR court on May 31 and had arrived as she was leaving. Claramunt obtained a PPO against Adriane that day, which also appears to have never been served. Claramunt testified that he was given the PPO that Adriane had obtained against him

and tried to clarify some of its terms with the JDR court. But he did not identify who had given him that PPO. The "personal service" box on the return sheet is unchecked, and the remaining information—including the serving officer, the date and time of service, and a description of Claramunt—is blank.

After leaving the court, Claramunt went to his son's school and explained to his son that he had a second protection order that superseded the prior no-contact EPO. He left the school with his son and had a similar conversation with his daughter at her school, but she did not leave with him. Claramunt then took his son to his workplace before going to the family residence. Claramunt went inside the house and retrieved some items, including a CPAP machine, computer, and work uniforms. They left the house after a few minutes.

The next day, Adriane swore out a criminal complaint against Claramunt, accusing him of "stalking" her. Claramunt was arrested and charged with violating the EPO. The JDR court found him guilty and sentenced him to ten days in jail, with nine days suspended.

Claramunt appealed to the circuit court, which held a bench trial. Following the evidence, Claramunt argued that the EPO expired once the PPO was issued and that he was not bound by the EPO when he made non-hostile contact with his children. The circuit court found that the EPO remained in effect and that Claramunt had violated its terms. The court sentenced him to five days in jail, with four days suspended.

A panel of this Court reversed, concluding that the PPO became effective and superseded the EPO because Claramunt had "actual notice" of the PPO. *Claramunt v. Commonwealth*, 84 Va. App. 391, 402 (2025). The panel further concluded that the EPO automatically dissolved once the PPO took effect. *Id.* at 396. Accordingly, in the panel's view, Claramunt could not be convicted of violating the superseded EPO. *Id.* at 403.

We granted the Commonwealth's petition for rehearing en banc and stayed the mandate. *See* Rule 5A:35(b). We now affirm Claramunt's conviction.

ANALYSIS

We review issues of statutory interpretation de novo. *Commonwealth v. Canales*, 304 Va. 200, 211 (2025). The "primary objective [of statutory construction] is 'to ascertain and give effect to legislative intent,' as expressed by the language used in the statute." *Id.* at 214 (quoting *Commonwealth v. Delaune*, 302 Va. 644, 655 (2023)). "When the language of a statute is plain and unambiguous, we are bound by the plain meaning of that statutory language." *Jones v. Commonwealth*, 296 Va. 412, 415 (2018) (quoting *Alston v. Commonwealth*, 274 Va. 759, 769 (2007)). "[T]he underlying factual determinations of the circuit court are entitled to deference on appeal." *Canales*, 304 Va. at 211.

There are three types of protective orders under Virginia law: EPOs, PPOs, and final protective orders.[2] A judge or magistrate may issue an EPO upon a finding "that reasonable grounds exist to believe that the respondent has committed family abuse and there is probable danger of a further such offense against a family or household member by the respondent." Code § 16.1-253.4(B). An EPO automatically "expire[s] at 11:59 p.m. on the third day following issuance" or, "[i]f the expiration occurs on a day that the court is not in session," at "11:59 p.m. on the next day that the [JDR] court is in session." Code § 16.1-253.4(C). An EPO may be issued ex parte. Code § 16.1-253.4(A).

Whether or not the petitioner has first obtained an EPO, the JDR court "may issue a preliminary protective order against an allegedly abusing person in order to protect the health and safety of the petitioner or any family or household member of the petitioner." Code

---

[2] This case is governed by the provisions of Chapter 11, Article 4 of Title 16.1. Chapter 9.1 of Title 19.2 contains largely parallel provisions for protective orders issued by district courts and circuit courts.

§ 16.1-253.1(A). The PPO must set a date for a full hearing on whether to grant a final protective order, which must be held within 15 days of the issuance of the PPO, barring some exceptions. Code § 16.1-253.1(B). A PPO may also be issued ex parte. Code § 16.1-253.1(A).

Finally, the court can only enter a final protective order after a hearing on the merits and a final protective order cannot be issued ex parte. Code § 16.1-279.1. The court can enter the final protective order for up to two years, or up to four years if the court finds that the respondent has violated another protective order within the past ten years. Code § 16.1-279.1(B).

For all three types of protective orders, a copy must be "forwarded forthwith to the primary law-enforcement agency responsible for service and entry of protective orders." Code §§ 16.1-253.1(B), -253.4(E), -279.1(C). A copy of an EPO or final protective order must "be served forthwith upon the respondent and due return made to the court." Code §§ 16.1-253.4(E), -279.1(C). The statutes pertaining to EPOs and final protective orders are silent as to the method of service and when the protective orders take effect.

The statute governing PPOs is more specific regarding service. A PPO must "be served forthwith on the allegedly abusing person *in person* as provided in [Code] § 16.1-264 and due return made to the court." Code § 16.1-253.1(B) (emphasis added). The statute further specifies that "[t]he preliminary order is effective upon personal service on the allegedly abusing person." Code § 16.1-253.1(C). Similar language also appears in the statute governing PPOs issued under Title 19.2. *See* Code § 19.2-152.9(C) ("The preliminary order is effective upon personal service on the alleged perpetrator."). But that language does not appear in the statutes governing EPOs or final protective orders. *See* Code §§ 16.1-253.4, -279.1; 19.2-152.8, -152.10.

That statutory difference ultimately governs this case. Claramunt argues that he cannot have been convicted of violating the EPO for conduct that occurred after the PPO issued because, in his view, the PPO superseded the EPO as a matter of law. Even assuming a valid

- 5 -

PPO automatically supersedes an existing EPO, however, and reading the evidence in the light most favorable to the Commonwealth, the May 31 PPO was never served and thus was never "effective."[3]

As an initial matter, Claramunt's argument that he was served with the PPO on May 31 fails to read the evidence in the light most favorable to the Commonwealth. The service return sheet plainly indicates that Claramunt was not personally served. The only contrary evidence in the record was Claramunt's own testimony that some unspecified party had given him a copy of the PPO. The circuit court was not required to believe that testimony. *See Jones v. Commonwealth*, 279 Va. 295, 300 (2010) (explaining that a factfinder is "entitled to discount [a defendant's] self-serving statements"). And even if the circuit court did credit Claramunt's testimony, that testimony was too vague to prove as a matter of law that adequate personal service had occurred, particularly given the other evidence that it had not.[4]

Turning to the statutory interpretation question, "effective" means "in operation at a given time." *Effective*, *Black's Law Dictionary* (12th ed. 2024). When the General Assembly amends a statute, the pre-amended version applies until the amended statute's effective date. *Cf.*

---

[3] "[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. White*, 293 Va. 411, 419 (2017) (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015)). Here, the best and narrowest ground is that the PPO did not supersede the EPO because Claramunt was never personally served with the PPO. Holding that a PPO and EPO can exist simultaneously, even when they contain mutually exclusive conditions, would risk confusing courts, law enforcement, and especially the parties about the terms imposed upon the respondent. It would also complicate trials, as the Commonwealth would have to prove that a defendant who violated an order knew which of the terms he had to comply with. And it would raise the possibility that a defendant may be charged with violating multiple orders for a single act. Applying the plain meaning of Code § 16.1-253.1(C) avoids those concerns.

[4] The dissent suggests that we are "look[ing] beyond the four corners of the PPO" and relying on "witness testimony from a subsequent proceeding." To be clear, we are not relying on Claramunt's testimony. To the contrary, we are explaining why Claramunt cannot rely on that testimony. As for the fact that the ex parte box on the PPO was unchecked, we do not dispute that Claramunt was present and had actual notice.

*Burks v. Commonwealth*, 126 Va. 763, 767 (1919) ("It is undoubtedly true as a general proposition of law that until the time arrives for a statute to take effect, all acts purporting to have been done under it are null and void."); *see also Va. Elec. & Power Co. v. State Corp. Comm'n*, 300 Va. 153, 165 (2021) (discussing retroactivity principles); Code § 1-214 (establishing the effective dates for statutes). And just as a statute cannot be applied before its effective date, an order cannot bind a party until it takes effect. It follows that an order cannot supersede an existing order before the subsequent order becomes effective. For PPOs, that occurs upon personal service. Code § 16.1-253.1(C).

The plurality, concurrence, and dissent in *Logan v. Commonwealth*, 72 Va. App. 309 (2020) (en banc), *aff'd*, 299 Va. 741 (2021), all recognized as much. The issue in *Logan* was whether an affidavit of service return was testimonial for Confrontation Clause purposes.[5] *Id.* at 319-20. Although the Court split on the Confrontation Clause question, all three opinions agreed that a PPO has no effect until it is personally served on the respondent. *See id.* at 320 ("Since the protective order is not valid unless personally served . . . ."); *id.* at 326 (Athey, J., concurring) (characterizing "service of process" as "triggering the protective order's validity"); *id.* at 329 (Huff, J., dissenting) (stating that a PPO "is of no force and effect, and thus, a legal nullity unless and until personally served upon the respondent by a law enforcement officer"). Here, we recognize merely what every judge of this Court recognized in 2020.

The argument that personal service is but one non-exclusive way a PPO can become effective is a non-starter. "[W]hen a legislative enactment limits the manner in which something may be done, the enactment also evinces the intent that it shall not be done another way." *Miller & Rhoads Bldg., L.L.C. v. City of Richmond*, 292 Va. 537, 544 (2016) (quoting *Grigg v.*

---

[5] *Logan* dealt with a preliminary protective order issued by a circuit court under Code § 19.2-152.9, which contains the same personal service language as Code § 16.1-253.1.

- 7 -

*Commonwealth*, 224 Va. 356, 364 (1982)). "Stated another way, 'the mention of specific items in a statute implies that all items omitted were not intended to be included." *Id.* (quoting *Va. Dep't of Health v. NRV Real Estate, LLC*, 278 Va. 181, 188 (2009)). Personal service is the only method referenced in the statute of making a PPO effective. So, according to normal statutory construction principles, it is the only way to make a PPO effective.

Moreover, we "presume[] that every part of a statute has some effect, and [we] will not consider any portion meaningless unless absolutely necessary." *May v. R.A. Yancey Lumber Corp.*, 297 Va. 1, 14 (2019) (quoting *Logan v. City Council*, 275 Va. 483, 493 (2008)). "When the General Assembly includes specific language in one statute, but omits that language from another statute, courts must presume that the exclusion of the language was intentional . . . ." *Jordan v. Commonwealth*, 295 Va. 70, 75 (2018) (quoting *Brown v. Commonwealth*, 284 Va. 538, 545 (2012)). "[T]he omission of such language in another statute represents an unambiguous manifestation of a contrary intention." *Id.* (quoting *Brown*, 284 Va. at 545).

The General Assembly chose to treat PPOs differently than other types of protective orders.[6] In fact, it did so in two separate titles of the Code, strongly demonstrating that the difference is intentional. To hold that a PPO becomes effective either upon issuance or upon

---

[6] Unlike PPOs, final protective orders cannot be issued ex parte. So, it is logical to conclude that the General Assembly may have recognized that final protective orders present fewer notice concerns than PPOs and do not require the extra notice protection of Code § 16.1-253.1(C). And EPOs, as the name suggests, are issued during emergencies and are short-lived, which could militate against requiring potentially time-consuming personal service before such orders can be effective. Regardless, "[i]t is not the province of the courts to 'inquire into the wisdom of legislation.'" *Williams v. Commonwealth*, 302 Va. 172, 177 n.4 (2023) (quoting *Hamilton v. Kentucky Distilleries & Warehouse Co.*, 251 U.S. 146, 161 (1919)). Rather, courts have a duty "to construe the law as it is written." *McKellar v. Northrop Grumman Shipbuilding, Inc.*, 290 Va. 349, 354 (2015) (quoting *Danville Radiologists, Inc. v. Perkins*, 22 Va. App. 454, 458 (1996)).

actual notice would fail to honor the General Assembly's choice and render the personal service language in Code § 16.1-253.1(C) wholly superfluous. This we cannot do.[7]

For that same reason, it is not difficult to square our position with *Hsiu Tsai v. Commonwealth*, 51 Va. App. 649 (2008), which involved a conviction for violating a final protective order issued under Code § 16.1-279.1. Unlike Code § 16.1-253.1, Code § 16.1-279.1 does not provide that a final protective order becomes effective upon personal service. Thus, failure to serve a final protective order is not necessarily fatal to a charge for violating that order, if the defendant had actual knowledge of the order's terms. *Id.* at 653. But *Hsiu Tsai* does not mean that a defendant charged with violating a PPO would be unable to raise such a defense, given the language of Code § 16.1-253.1(C). Ultimately, the different results are easily explained by the different language in the statutes dealing with PPOs and final protective orders.

In short, the EPO remained in effect because Claramunt was never personally served with the PPO. Accordingly, the trial court did not err by convicting Claramunt of violating the EPO.

---

[7] The dissent's use of Code § 16.1-253.1(B) omits some context. That subsection requires the lower court to hold a hearing "within 15 days of the issuance of the preliminary order, unless the hearing has been continued." Code § 16.1-253.1(B). It further states:

> If the respondent fails to appear at this hearing because the respondent was not personally served, or if personally served was incarcerated and not transported to the hearing, the court may extend the protective order for a period not to exceed six months. The extended protective order shall be served forthwith on the respondent. However, where the respondent shows good cause, the court may continue the hearing. The preliminary order shall remain in effect until the hearing.

*Id.* The sentence that the PPO "shall remain in effect until the hearing" does not immediately follow the sentence dealing with a respondent who has not been served. Indeed, in between those two sentences is a sentence requiring service.

- 9 -

## CONCLUSION

For these reasons, the trial court's judgment is affirmed.

*Affirmed.*

Raphael, J., with whom Athey, Friedman, Lorish, Callins and White, JJ., join, concurring in the judgment.

I join in the Court's judgment affirming Diego Claramunt's conviction for violating the EPO, but I do so on different grounds from the plurality. Based on the plain language of the EPO statute, the statutory scheme, and an earlier opinion of the Attorney General, I would hold that an EPO remains in effect during its short lifespan unless sooner dissolved or modified by express order of the court. So it does not matter here whether the PPO was served by a law-enforcement officer on Claramunt or whether he had actual knowledge of its terms. The EPO remained in effect for the balance of the three-day period it covered because the juvenile and domestic relations district court that issued the PPO did not expressly dissolve or modify the EPO.

Claramunt argues that when the JDR court issued the May 31 PPO, it implicitly modified and superseded the May 29 EPO. Alternatively, he claims that the EPO was modified "the minute he [was] handed" the PPO. It does not matter, Claramunt claims, that the JDR court did not explicitly dissolve or modify the EPO.

The Commonwealth offers alternative arguments in response. First, the Commonwealth asserts that the PPO never took effect—and therefore never superseded the EPO—because the PPO was not personally served on Claramunt; the return-of-service box was not completed. The Commonwealth emphasizes Code § 16.1-253.1(C), which says that a PPO "is effective upon personal service on the allegedly abusing person." Second, even assuming the PPO took effect when Claramunt learned about it, the Commonwealth maintains that the EPO was also still in effect because it had not been dissolved or modified.

The plurality agrees with the Commonwealth's first argument and would not reach the second; I agree with the Commonwealth's second argument and would not reach the first. Accepting the Commonwealth's first argument risks immunizing an abuser who knowingly violates a PPO on the technicality that a law-enforcement officer has not yet formally served it.

Such a ruling would be in tension with *Hsiu Tsai v. Commonwealth*, 51 Va. App. 649 (2008), where we said that a defendant could be found in contempt for violating a protective order when the defendant *either* had been personally served with it *or* had "*actual* notice" of its terms. *Id.* at 654 (quoting *Calamos v. Commonwealth*, 184 Va. 397, 403 (1945)). The plurality would limit *Hsiu Tsai*'s holding to final protective orders. But doing so would reduce the deterrent value of PPOs. When abusers violate a PPO with actual knowledge of its terms, they should not be shielded from liability by the fortuity that formal service has not yet been perfected.[8]

Notably, the circuit court did not rely on the Commonwealth's no-personal-service argument. The circuit court instead concluded that the EPO here was still in effect and had not been superseded.

The circuit court got it right. Five reasons show why.

First, nothing in the text of the EPO statute, Code § 16.1-253.4, says that an EPO is implicitly modified, let alone superseded, when a PPO is issued during the three days in which an EPO remains in effect. To the contrary, the statute specifies only one method to alter an EPO within the three-day period: "The respondent may at any time file a motion with the court requesting a hearing to dissolve or modify the order issued hereunder." Code § 16.1-253.4(C). Claramunt did not ask the JDR court to dissolve or modify the EPO.

Second, the absence of language in the EPO statute providing for automatic supersession by a PPO is notable when compared to the PPO statute, which contains such a provision: if the

---

[8] Had Claramunt been prosecuted here for violating the PPO instead of the EPO, it would be difficult to say that he did not have actual knowledge of its terms. Adriane's sworn criminal complaint said that Claramunt was "aware of the PPO because he told our son . . . about it yesterday." The son testified that when Claramunt picked him up from school, Claramunt said "he was given a second protection order that super[s]eded the one from the day before." Claramunt said the same thing during his own testimony, claiming that he left the JDR court with copy of the PPO in hand shortly after it issued. The trial court did not question that Claramunt had actual knowledge of the PPO—only whether Claramunt was truly "confused" about what he was allowed to do. "[M]aybe there was confusion," the court said, "I just can't tell."

court is closed on the return day for a PPO hearing, "the preliminary protective order shall remain in full force and effect until it is dissolved by such court, *until another preliminary protective order is entered, or until a protective order is entered*." Code § 16.1-253.1(B) (emphasis added). The General Assembly thus knew how to provide for an EPO to be automatically superseded if that is what it wanted. "[W]hen the General Assembly has used specific language in one instance, but omits that language or uses different language when addressing a similar subject elsewhere in the Code, we must presume that the difference in the choice of language was intentional." *Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011).

Third, a 2019 formal opinion by the Attorney General strongly supports the circuit court's conclusion. 2019 Op. Va. Att'y Gen. 141. That opinion summarized the statutory scheme governing EPOs, PPOs, and final protective orders. *Id.* at 141-42. The Attorney General concluded that when a second protective order issues during the term of an earlier protective order and the statute, as here, "do[es] not provide that one such order supersedes" the earlier one, "it is reasonable to conclude that the legislature intended that the prior order remain in effect until it expires by its own terms or by operation of law or is dissolved by the court." *Id.* at 143. So when "more than one active protective order exists involving the same parties, an individual may be charged with violating a discrete provision of either order." *Id.* The 2019 opinion focused specifically on the situation where a defendant violated a final protective order and the trial court issued a second protective order without modifying or dissolving the first one. *Id.*; *see* Code § 16.1-253.2(D) ("Upon conviction, the court shall, in addition to the sentence imposed, enter a protective order pursuant to § 16.1-279.1 for a specified period not exceeding two years from the date of conviction."). But the same principle applies here. Because neither the EPO

nor the PPO statute provides for an EPO to be superseded by operation of law when a PPO issues, there is no implied supersession.

Although the 2019 opinion of the Attorney General does not bind us, it is entitled to significant weight, much like the opinion in *Beck v. Shelton*, 267 Va. 482, 492 (2004). The opinion about the statute there was "five years" old and the General Assembly had "done nothing to change it." *Id.* The Court said that "[t]he legislature is presumed to have had knowledge of the Attorney General's interpretation of the statutes, and its failure to make corrective amendments evinces legislative acquiescence in the Attorney General's view." *Id.* (quoting *Browning-Ferris, Inc. v. Commonwealth*, 225 Va. 157, 161-62 (1983)). The same is true here. The General Assembly has been aware of the 2019 opinion for six years and has likewise taken no action to provide for a PPO to automatically supersede an EPO. That inaction is all the more remarkable since the legislature just this year amended a different provision of the EPO statute. *See* 2025 Va. Acts ch. 26 (adding sentence to Code § 16.1-253.4(B) concerning juvenile respondents).

Fourth, Claramunt's claim that an EPO is implicitly superseded whenever a PPO issues (or whenever the respondent learns of it short of formal service) is at odds with the statutory mechanism for ensuring the accuracy of the Virginia Criminal Information Network (VCIN). Service of the PPO must be made by the "law-enforcement agency responsible for service" and, upon service, that agency must enter "the date and time of service and other appropriate information" into the VCIN database. Code § 16.1-253.1(B). Without a law-enforcement officer's serving the PPO on Claramunt, the database would not reflect that he knew about it. In other words, if we were to accept Claramunt's position that the EPO was implicitly superseded "the minute he [was] handed that [PPO] order" by the JDR judge, there would be no mechanism

for the VCIN database to record that the PPO had been served, let alone that it superseded the EPO.

That problem is further proof that a PPO does not implicitly supersede or modify an EPO unless the trial court says so. For only when an EPO is "dissolved or modified" by an actual court "order" is that information and the order itself "forwarded forthwith to the primary law-enforcement agency responsible for service" on the respondent and for recording "any modification as necessary" in the VCIN database. Code § 16.1-253.4(E).

Finally, deciding this case on the ground that the EPO remained in effect despite the issuance of the PPO and despite Claramunt's actual knowledge of the PPO avoids creating protection gaps for victims. Under the plurality's approach, by contrast, a PPO will never protect the victim until a law-enforcement officer formally serves it on the abuser, even when the abuser has actual knowledge of its terms by, for example, having received a copy from the JDR judge or from the victim's attorney.[9]

It is true that if a court issues a PPO without explicitly modifying or dissolving an EPO with different terms, the respondent will have to comply with the more demanding order until the EPO expires. But since an EPO lasts for only three days, the problem of having conflicting

---

[9] Claramunt argued at the panel stage that the circuit court erred in finding him guilty of violating the EPO because, after his appearance before the JDR judge, he "believed he could have contact with his children and retrieve his belongings from his home after inquiring of the court." Claramunt Br. 1 (2-8-2024). To be sure, good-faith reliance on a JDR judge's statement that a protective order is no longer in effect can be an affirmative defense to a contempt charge. *Davis v. Commonwealth*, 68 Va. App. 725, 733-34 (2018). As we said in *Davis*, "it 'would be an act of "intolerable injustice" to hold criminally liable a person who had engaged in certain conduct in reasonable reliance on a judicial opinion instructing that such conduct is legal.'" *Id.* at 733 (quoting *United States v. Brady*, 710 F. Supp. 290, 295 (D. Colo. 1989)). But Claramunt did not make that argument in the trial court. *See* Rule 5A:18. And he has now omitted that assignment of error and abandoned it altogether in his en banc brief. *See* Rule 5A:20(e).

orders, if it arises at all, is quite limited. And the trial court can solve that problem by providing that the PPO supersedes the EPO once the PPO is served on the respondent.[10]

In short, the May 29 EPO against Claramunt remained operative because the JDR court did not dissolve or modify it when issuing the May 31 PPO. So the circuit court did not err in finding Claramunt guilty of violating the EPO.

---

[10] Form DC-627 ("Preliminary Protective Order—Family Abuse") does not contain a preprinted box asking the judge to indicate whether the PPO upon service should supersede, dissolve, or modify a previously issued EPO. Adding that option to the form could help reduce the risk that a trial judge who issues a PPO might inadvertently fail to correct for inconsistent terms in the EPO.

Chaney, J., with whom Causey and Bernhard, JJ., join, dissenting.

We respectfully dissent. This appeal hinges on two dispositive questions. The first is whether a preliminary protective order ("PPO") becomes effective when a respondent appears before the issuing court and receives the protective order, even absent formal service by law enforcement. The second is whether the PPO supersedes an earlier emergency protective order ("EPO") for purposes of criminal enforcement.[11] Both questions, in our view, are answered clearly by the law and the record: the PPO was effective and controlling over the EPO.

On this record, we conclude that when the juvenile and domestic relations district court ("JDR court") issued the PPO, recorded Mr. Claramunt's appearance at the order-issuing hearing, and treated the PPO as the operative instrument, the earlier EPO was superseded for purposes of criminal enforcement and could not serve as a basis for conviction. The record, governing law, and fundamental fairness lead us to conclude that Mr. Claramunt's conviction should not stand.[12]

---

[11] As the concurrence recognizes, the plurality does not resolve the second question, while the concurrence does not resolve the first. Neither provides a rule of law or a controlling rationale resolving both issues, as contemplated by Code § 17.1-402(D)(ii). Apart from affirming Claramunt's conviction, this Court agrees on no doctrinal point raised in this appeal. Under well-established principles, only the "narrowest grounds" shared between opinions carry precedential force. *See, e.g.*, *Marks v. United States*, 430 U.S. 188, 193 (1977); *Crawford v. Commonwealth*, 55 Va. App. 457, 472 n.11 (2009); *see also* Bryan A. Garner, et al., *The Law of Judicial Precedent* 195 (2016) ("With a plurality decision, the only opinion to be accorded precedential value is that which decides the case on the narrowest grounds."). But here, the separate opinions take different paths to affirmance and do not share a common rationale on both questions.

[12] At oral argument, the Commonwealth acknowledged that, if the facts were as Mr. Claramunt testified, a defense based on judicial misinstruction could be "potentially meritorious." However, because the court made no explicit credibility findings on his related allocution, the Commonwealth instead relied on a preservation waiver to defend the conviction. Here, the judge who issued the PPO expressly addressed its terms to Mr. Claramunt, who engaged only in conduct that the court indicated was permissible, conduct for which he was later prosecuted.

The positions advanced by the Commonwealth and the concurrence—that the EPO and PPO remained concurrently enforceable for criminal purposes—are difficult to reconcile with the statutory structure governing protective orders and raise due-process concerns.[13] Permitting a magistrate-issued EPO to remain in controlling effect under the concurrence's novel theory that "the respondent must comply with the more demanding order until the EPO expires" inverts judicial hierarchy by rendering a judge's order subordinate to that of a magistrate and creates confusion and impracticality in the enforcement of sequential protective orders addressing the same parties and subject matter.

The plurality's conclusion—that a PPO is ineffective absent formal service by law enforcement—is likewise difficult to square with the statutory text, both in context and within the broader statutory scheme. By framing the issue more narrowly than the circumstances warrant, the plurality's reasoning leads to untenable results. Respondents who appear before a judge, receive a PPO, and conform their conduct to the court's directives may nevertheless face criminal prosecution for conduct the court expressly permitted, solely because they received judicial, rather than law-enforcement notice. Conversely, the same reasoning permits a respondent to disregard a court order of which he has actual notice, even while holding a copy in hand, so long as service has not been formally executed. This creates a new and unwarranted safe harbor from contempt, contrary to this Court's precedents recognizing that actual notice suffices to sustain contempt of court.

---

[13] Ordinarily, we do not reach constitutional questions needlessly, and Mr. Claramunt did not preserve an independent due-process challenge. *Commonwealth v. Swann*, 290 Va. 194, 196-97 (2015). But the concurrence expressly introduces due process concerns as part of its statutory analysis, asserting that concurrent enforcement of the EPO and PPO presents no constitutional infirmity. Because the concurrence makes due process implications an unavoidable part of its interpretive framework, we address those implications only as needed to explain why its reading of the statute and analysis of this case should not stand.

The weaknesses in both the plurality's and the concurrence's approaches are revealed, in part, by their mutual inconsistency. Our distinguished colleagues, in determining the outcome of this appeal, cannot agree on the governing law, which underscores the instability of both interpretations. Our dissenting construction, recognizing the PPO as the controlling order once the respondent receives actual notice, particularly when his appearance is noted on the order by the issuing court, preserves judicial hierarchy and ensures that protective orders function as intended by providing clear guidance and meaningful protection, not conflicting commands.

Because the Commonwealth prosecuted Mr. Claramunt for violating the earlier superseded EPO instead of the later PPO, his conviction should be reversed.

BACKGROUND

The relevant facts are undisputed. On May 29, 2022, Adriane Claramunt obtained an EPO under Code § 16.1-253.4. The order, issued by a magistrate, was served on Mr. Claramunt at 12:03 a.m. on May 30. It prohibited contact "of any kind with [Ms. Claramunt] and [their children]" and awarded Ms. Claramunt temporary possession of the marital home "to the exclusion of [Mr. Claramunt]." The EPO was "set to expire on June 1, 2022" at 11:59 p.m.

On May 31, Ms. Claramunt obtained a PPO from a JDR court judge under Code § 16.1-253.1. The PPO differed from the earlier EPO by granting Ms. Claramunt temporary exclusive use of a vehicle, permitting Mr. Claramunt "no hostile contact" with his children, and requiring him to maintain household utilities and "immediately leave and stay away from the residence." All other provisions were restated, and the PPO extended the duration for 15 days, until June 15, 2022. Def. Ex. 1. The PPO reflected that both parties appeared before the court for the hearing by leaving the "ex parte hearing" box unchecked.

After issuing the PPO, the judge heard Mr. Claramunt's separate petition for a protective order against Ms. Claramunt. The judge granted that petition and, in contrast to the earlier PPO

- 19 -

entered against Mr. Claramunt, checked the ex parte box. Def. Ex. 2. Having been provided a copy of the PPO, Mr. Claramunt asked the judge about its terms. R. 122. According to Mr. Claramunt's allocution when appearing for trial before the circuit court, the judge told him he could retrieve personal belongings from the marital home and see his son under the new order. Relying on that understanding, Mr. Claramunt picked up his son from school, entered the residence briefly to gather his military uniform and CPAP machine while Ms. Claramunt was absent, and then left without incident.

On June 1, Ms. Claramunt swore out a criminal complaint against Mr. Claramunt, asserting "he has violated a no contact PPO against me several times in the last few days," indicating her understanding that the PPO governed on May 31 when Mr. Claramunt entered the home. R. 5. She also stated Mr. Claramunt "was aware of the PPO because he told our son . . . about it." R. 5. The son also testified that Mr. Claramunt told him about the PPO. R. 109. A magistrate nevertheless issued a warrant charging a violation of the EPO, not the PPO. The court subsequently convicted Mr. Claramunt, and the circuit court affirmed on de novo appeal. The record contains no express determination rejecting as incredible Mr. Claramunt's statements regarding his reliance on the judge's in-court guidance concerning the PPO and his resulting, conforming conduct. In convicting Mr. Claramunt, however, the circuit court reasoned that "[t]he court speaks through its orders" and that the EPO remained in effect at the time of the alleged violation. R. 138.

ANALYSIS

Mr. Claramunt was convicted under Code § 16.1-253.2 for violating an EPO that overlapped in time with a PPO. He assigns a single error:

> The trial court erred in finding the appellant guilty of violation of
> an emergency protective order (EPO) on the afternoon of May 31,
> 2022, because the EPO was *no longer in effect* due to the court

> entering a preliminary protective order (PPO) for the same parties on the morning of May 31, 2022.

Op. Br. 1 (emphasis added). Whether the EPO remained legally operative for purposes of criminal prosecution "presents a mixed question of law and fact that we review de novo on appeal." *Cost v. Commonwealth*, 275 Va. 246, 250 (2008). Further, courts "have the authority to interpret their own orders." *Roe v. Commonwealth*, 271 Va. 453, 457 (2006). Upon judicial review, "this Court accords deference to the [issuing] court's interpretation" but "that interpretation must be reasonable." *Id.* at 458. This deference reflects the distinction between interpretation and alteration: interpretation is the explanation of what an entered order already does; alteration is a subsequent written entry that modifies the terms of the prior order.[14]

### I. Remedial Construction of Protective Order Statutes Advancing Safety

This Court has stated that "protective order statutes are remedial and should be liberally construed to effectuate the purpose of the statute." *Happe v. Zimmerman*, 77 Va. App. 667, 677 (2023). Code § 16.1-253.1(A) authorizes the issuance of a preliminary protective order "to protect the health and safety of the petitioner or any family or household member." "Remedial statutes are to be 'construed liberally to *suppress the mischief* and advance the remedy' in accordance with the legislature's intended purpose." *Rector & Visitors of the Univ. of Va. v. Harris*, 239 Va. 119, 124 (1990) (quoting *Bd. of Supervisors v. King Land Corp.*, 238 Va. 97, 103 (1989)).

The mischief here is continued exposure to potential harm; the remedy is protection from the alleged abusive person. A construction requiring strict formal service, even where the respondent has actual notice, creates gaps in protection—allowing the respondent to circumvent a process server and thereby avoid the mandates of the PPO—which undermines the remedial

---

[14] That a court speaks through its written orders did not prevent the issuing court from interpreting the entered PPO as the operative framework.

- 21 -

purpose. When Mr. Claramunt appeared before the court, received the PPO, and understood its terms, the remedial purpose of notice was fulfilled. Requiring formal service despite actual knowledge frustrates, rather than advances, the statute's purpose.

## II. Sequential Structure of Virginia's Protective Order Statutes

Virginia's protective-order statutes are designed to function sequentially, not concurrently. An EPO provides temporary protection for up to 72 hours from issuance. Code § 16.1-253.4(C). Although an EPO is not a prerequisite for issuing a PPO under Code § 16.1-253.1, when an EPO exists, the PPO becomes the next procedural step—extending or modifying protections for up to 15 days until a permanent order may issue under Code § 16.1-279.1. Reading EPOs and PPOs as concurrently operative—even when their terms conflict— undermines the legislature's structured progression. "Statutes which have the same general or common purpose or are parts of the same general plan are also ordinarily considered as *in pari materia*." *Prillaman v. Commonwealth*, 199 Va. 401, 405 (1957). Thus,

> statutes are considered as if they constituted but one act, so that sections of one act may be considered as though they were parts of the other act, as far as this can reasonably be done . . . where legislation dealing with a particular subject consists of a system of related general provisions indicative of a settled policy, new enactments of a fragmentary nature on that subject are to be taken as intended to fit into the existing system and to be carried into effect conformably to it, and they should be so construed as to harmonize the general tenor or purport of the system and make the scheme consistent in all its parts and uniform in its operation, unless a different purpose is shown plainly or with irresistible clearness.

*Morgan v. Commonwealth*, 301 Va. 476, 481 (2022) (alteration in original) (quoting *Prillaman*, 199 Va. at 405). Moreover,

> [i]t is a cardinal principle of law that penal statutes are to be construed strictly against the State and in favor of the liberty of a person. Such a statute cannot be extended by implication, or be made to include cases which are not within the letter and spirit of the statute.

*Wade v. Commonwealth*, 202 Va. 117, 122 (1960). Where, as here, multiple plausible readings of overlapping protective-order provisions exist, *Wade* requires adoption of the interpretation that narrows criminal liability rather than expands it by implication to impose simultaneous, conflicting commands. *Id.*

The statutory scheme provides that the EPO temporarily preserves safety *until the court acts*, and the 72-hour duration clause describes the maximum permissible lifespan rather than a guarantee of continuing force once a court issues a controlling subsequent order, including a PPO. *See* Code §§ 16.1-253.1, 16.1-253.4. Our reading is supported by the text of Code § 16.1-253.4, which contemplates that the EPO can be dissolved, demonstrating that "shall expire" is not an absolute duration but serves as the outer time limit for the EPO.[15] In other words, in some cases, an EPO can terminate or dissolve before those 72 hours elapse. If that were not true, then the statute would not provide language on dissolution.

Thus, when a court issues a PPO involving the same parties and including terms that conflict with the EPO as to their conduct, the EPO's legal and practical authority may terminate before the 72-hour mark, as in this case. In applying the sequential scheme to any record, the issuing court may interpret the operative effect of the later-entered PPO on an antecedent EPO without altering either order's text. *See Roe*, 271 Va. at 457-58. A construction that permits both orders to govern simultaneously—especially where their terms conflict—contradicts the legislature's structured progression from emergency relief to judicial supervision.

III. A judicially-issued PPO supersedes a magistrate-issued temporary EPO for criminal enforcement.

The Commonwealth argues that because Code § 16.1-253.4(C) provides a 72-hour lifespan and Code § 16.1-253.1(C) states that a PPO becomes "effective upon personal service,"

---

[15] "An emergency protective order issued pursuant to this section shall expire at 11:59 p.m. on the third day following issuance." Code § 16.1-253.4

- 23 -

the EPO remained criminally enforceable when Mr. Claramunt entered the marital home.  That

reading does not fully account for the statutory scheme.

A.  *Magistrate authority is subordinate to judicial authority.*[16]

Code § 19.2-45 enumerates narrow, limited magistrate powers, and Code § 19.2-35

places magistrates under the "supervisory authority" of the Executive Secretary of the Virginia

Supreme Court.  Magistrates issue EPOs under Code § 16.1-253.4 only to furnish immediate

relief.  Treating a magistrate's temporary order as controlling after a judge issues a

comprehensive PPO involving the same parties and conflicting terms is inconsistent with the

judicial hierarchy established by the Code.  The concurrence adopts such treatment, which

allows a magistrate's emergency order to stand in conflict with a judge's subsequent directive.

Under Virginia statute, a magistrate may issue arrest and search warrants, admit to bail or

commit offenders to jail, issue criminal and civil warrants and subpoenas, administer oaths, act

as a conservator of the peace, and perform only those other acts *expressly authorized by law*.  *See*

Code § 19.2-45.  By contrast, here, the court's issuance of the PPO was an interpretation of the

effect of its entered order and merits deference because it aligns with the written terms and the

statutory sequence.

B.  *Legislative design establishes the EPO as a temporary bridge.*

Code § 16.1-253.4(C) requires that when issuing an EPO, the issuing authority "shall

provide the protected person . . . with the form for use in filing petitions pursuant to § 16.1-253.1

and written information regarding protective orders."  This clause confirms that the EPO is

intended as a temporary bridge that anticipates a potential forthcoming PPO.  The legislature

---

[16] The plurality and concurrence do not address in detail the statutory hierarchy between magistrates and judges.

required magistrates, when issuing an EPO, to provide the petition form for filing under § 16.1-253.1 because the next step—the PPO—is intended to replace, not coexist with, the EPO.

Moreover, when a court enters a subsequent order covering the relevant conduct of the parties, the later order supersedes a modifiable prior order. *See, e.g.*, *Houghton v. Meyer*, 208 U.S. 149, 157 (1908) ("A new and permanent injunction in favor of the plaintiffs was granted. This decree necessarily superseded the [temporary] restraining order, and it expired by the limitation contained in its terms."); *Kennedy v. Kennedy*, 83 Va. Cir. 439, 440 (Fairfax Cnty. 2011) ("The 2008 order, being later in time [to the order of divorce], superseded any prior agreements between the parties related to the division of the pension.").[17]

The principle that a subsequent order by a court of competent jurisdiction functionally supersedes provisions of an earlier one applies with equal force to protective orders. The issuance of a PPO functions as a subsequent modification, rendering the EPO operationally superseded, particularly on these facts, which cover the same parties, add new conflicting conditions, and extend the duration.

Neither the EPO nor the PPO statute requires explicit vacatur language.[18] *See* Code §§ 16.1-253.1, 16.1-253.4. The court's issuance of a new order with conflicting provisions for

---

[17] As a circuit court case, *Kennedy* is not a binding precedent on this Court, but it remains instructive. *See City of Va. Beach v. Mathias*, 85 Va. App. 94, 116 (2025) ("[C]ircuit court decisions are not binding.").

[18] This Court has recognized that EPOs can be converted to PPOs, supporting the supersession principle. In *Fendley v. Fendley*, No. 1430-20-2, slip op. at 2, 2021 Va. App. LEXIS 149, at *2 (Aug. 3, 2021), this Court stated: "The emergency protective order was *converted* to a preliminary protective order and extended twice." (Emphasis added).

"Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value." *Fergeson v. Commonwealth*, 84 Va. App. 80, 94 n.5 (2025) (quoting *Jones v. Commonwealth*, 71 Va. App. 375, 382 n.2 (2019)). As persuasive guidance, this language suggests that this Court has understood EPOs and PPOs not as parallel, independent orders but as sequential phases of protection, with the latter replacing the former. When a court "converts" an EPO to a PPO with different terms, the EPO's function ceases, and the PPO governs.

the same parties is a judicial act reflecting the intent to supersede the earlier emergency order. *Cf. Houghton*, 208 U.S. at 157; *Kennedy*, 83 Va. Cir. at 440. As Virginia has recognized, courts speak through their orders. *See Roe*, 271 Va. at 457-58. The maxim that "the court speaks through its orders" does not bar a court from interpreting the effect of a later-entered order on an earlier one. To the contrary, courts may construe their own orders to ascertain operative intent and effect. *See id.*

Although it does not require vacatur language, the EPO statute does provide a statutory default for how an EPO can be dissolved or modified before the 72 hours elapse. Code § 16.1-253.4(C) states, "[t]he respondent may at any time file a motion with the court requesting a hearing to dissolve or modify the order issued hereunder." Subsection (E) reinforces that option, providing that "[i]f the order is later dissolved or modified," certain procedural consequences follow. Code § 16.1-253.4(E). Although the statute uses the terms "dissolve" or "modify," it does not elaborate on who must initiate the change or what form a dissolution or modification must take. The statute also does not define those terms.

In this case, the EPO contained language exceeding the statutory default. The EPO stated: "this order remains in full force and effect unless and until dissolved or modified by the court." This self-limiting clause made the EPO's continued effectiveness contingent on later judicial action. Once the judge issued a PPO with materially different terms, such as allowing non-hostile contact with the children where the EPO barred all contact, that judicial act constituted a modification under the EPO's own terms.

IV. The negative-implication canon does not treat personal service as the only mechanism for PPO effectiveness.

The plurality invokes *expressio unius est exclusio alterius* ("the negative-implication canon")[19] to transform the sentence "The preliminary order is effective upon personal service on the allegedly abusing person," Code § 16.1-253.1(C), into "The preliminary order is *only* effective upon personal service." The plurality's application of the canon, however, does not fully account for the statutory context. Leading authorities explain that the negative-implication canon "must be applied with great caution, since its application depends so much on context." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012). The Supreme Court of Virginia has applied the canon sparingly, and in circumstances not present here.[20]

Moreover, Code § 16.1-253.1(B) undercuts a reading that makes personal service the exclusive prerequisite for effectiveness. Subsection (B) provides that a "court may extend" a PPO when "the respondent fails to appear at this hearing because the respondent was not personally served" and directs that "the preliminary protective order shall remain in full force

---

[19] The negative-implication canon and *expressio unius est exclusio alterius* express the same idea. *See generally* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107-08 (2012) (discussing the "negative-implication canon," or "[t]he expression of one thing implies the exclusion of others"); *see, e.g.*, *Fisher v. Tails, Inc.*, 289 Va. 69, 75 (2015) (applying "the statutory canon of *expressio unius est exclusio alterius* ('the express mention of one thing [in a statute's language] excludes all others')"); *In re Woodley*, 290 Va. 482, 490 n.9 (2015).

[20] In *Miller & Rhoads Building, L.L.C. v. City of Richmond*, 292 Va. 537 (2016), the Supreme Court applied the negative-implication canon where the legislature used detailed enumerations or direct contrasts to signal exclusion. *See id.* at 543-45 (city code provision expressly subjecting special-district taxes to four enumerated sections and no others); *Fisher*, 289 Va. at 74-75 (five enumerated "triggers" for appraisal rights excluded a sixth); *Va. Dep't of Health v. NRV Real Est., LLC*, 278 Va. 181, 186-88 (2009) (long statutory list of specific health-care services implied exclusion of "nursing home beds"). No similarly detailed enumerations or direct contrasts appear in Code § 16.1-253.1(C). The General Assembly did not provide an enumerated list of ways a PPO can become effective, nor did it contrast "personal service" with an obvious alternative, such as "actual notice," and then choose between them.

and effect" until the hearing.  Code § 16.1-253.1(B).  Subsection (B) is rendered meaningless, if subsection (C) is interpreted as requiring personal service as the exclusive prerequisite for effectiveness.[21]  This violates the canon of surplusage, which "discourage[s] any interpretation of a statute that would render any part of it useless, redundant or absurd."  *Owens v. DRS Auto. Fantomworks, Inc.*, 288 Va. 489, 497 (2014); *see id.* ("[W]e seek to read statutory language so as to give effect to every word.").

If PPOs possess no legal effect before personal service, there would be nothing to "extend" or "remain in full force" in the scenario arising under subsection (B).  If personal service were strictly required, the court would need to issue a new PPO when "the respondent fails to appear at th[e] hearing because the respondent was not personally served"—not extend an existing one.  Code § 16.1-253.1(B).  The General Assembly's choice of "extend" and "remain in full force and effect" must be given effect, and it demonstrates the Assembly's intent for PPOs to have legal effect independent of when formal service is effectuated.

---

[21] The plurality contends that the dissent's use of Code § 16.1-253.1(B) "omits some context."  *Supra* at 9 n.7.  They suggest that the intervening sentences interrupt the subsection's logical connection.  *Id.* ("The sentence that the PPO 'shall remain in effect until the hearing' does not immediately follow the sentence dealing with a respondent who has not been served. Indeed, in between those two sentences is a sentence requiring service.").  However, a proper reading of subsection (B), in light of the statutory structure, demonstrates those sentences are coherently addressing unserved respondents.  Subsection (B) addresses a specific scenario— where a respondent fails to appear at the scheduled hearing "because the respondent was not personally served."  Code § 16.1-253.1(B).  In such a scenario, subsection (B) authorizes the court to "extend the protective order for a period not to exceed six months," then mandates that the "extended protective order shall be served forthwith on the respondent," and then concludes that "the preliminary order shall remain in effect until the hearing."  *Id.*  The intervening sentence—"However, where the respondent shows good cause, the court may continue the hearing"—does not disrupt the logic or make the entire subsection incoherent.  Rather, the sentence clarifies the otherwise mandatory time for a hearing "within 15 days of the issuance of the preliminary order" and provides the respondent a statutory basis and the court's explicit authority to grant a continuance of the hearing.  More importantly, the sentence does not contradict the subsection's extension language, either.  The "remains in effect" sentence— following the "good cause" procedural exception sentence and the last in the subsection— ensures the petitioner's continuous protection, regardless of the delay for a hearing.

Taken in context, the clause "is effective upon personal service" identifies a sufficient condition for effectiveness, not the exclusive one.[22] Reading the clause as exclusive by essentially adding the word 'only' introduces a limitation that the legislature did not express. That would amount to the type of judicial augmentation this Court has repeatedly rejected. *See, e.g.*, *Dodson v. Kleffman*, 84 Va. App. 174, 193 n.12 (2025) ("Courts cannot 'add language to the statute that the General Assembly has not seen fit to include.'" (quoting *Wakole v. Barber*, 283 Va. 488, 495 (2012))).

V. The PPO became effective upon Mr. Claramunt's appearance and actual notice.

The constitutional standard for adequate notice does not require formalistic personal service when actual notice has been achieved. The Due Process Clause of the United States Constitution requires that a defendant be given fair notice of an action brought against him. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). Notice is constitutionally sufficient if "reasonably calculated . . . to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Tr. Co.*, 339 U.S. 306, 314 (1950).

Here, Mr. Claramunt appeared before the court that issued the PPO, received a copy of the order, and discussed its terms with the issuing court and later with his son. Ms. Claramunt herself acknowledged in her criminal complaint that Mr. Claramunt "was aware of" the PPO because "he told our son . . . about it." This record establishes notice "reasonably calculated" to

---

[22] The plurality places substantial weight on statements in the *Logan* decisions to suggest that a protective order "is of no force and effect" until personal service is effectuated. But those statements provide poor support for its position, as they are dicta, and they arose in a different context: whether a return of service is testimonial for Confrontation Clause purposes. *Logan v. Commonwealth*, 71 Va. App. 568, *aff'd on reh'g en banc*, 72 Va. App. 309 (2020), *aff'd*, 299 Va. 741 (2021).

inform Mr. Claramunt and far exceeds the constitutional minimum. Personal service is a means to an end—actual notice—not an end in itself.

The PPO itself establishes that it was effective on Mr. Claramunt because it records his presence at the hearing at which it was issued. As a result, the PPO was effective upon Mr. Claramunt under Code § 8.01-277.1 because "a person waives any objection to personal jurisdiction or defective process if he engages in conduct related to adjudicating the merits of the case, . . . [a]ctively participating in proceedings related to determining the merits of the case."

This case raises another due-process concern addressed in *Hsiu Tsai v. Commonwealth*, 51 Va. App. 649 (2008). There, this Court reversed a conviction under Code § 16.1-253.2 because the Commonwealth failed to prove the respondent had "*actual notice* of the making of such order or rendition of such judgment or decree." *Id.* at 654 (second emphasis added) (quoting *Calamos v. Commonwealth*, 184 Va. 397, 403 (1945)). The principle underlying *Hsiu Tsai*—that a protective-order violation may be prosecuted upon proof of actual notice— necessarily means an order becomes legally operative once actual notice is established.

The plurality attempts to limit *Hsiu Tsai* to final protective orders. But *Hsiu Tsai* and *Calamos* root the actual-notice requirement in due process, not in any textual distinction between preliminary and final orders. *Hsiu Tsai*, 51 Va. App. at 654; *Calamos*, 184 Va. at 403. Nothing in the due process doctrine supports affording respondents subject to PPOs less protection than those subject to final protective orders, where the same contempt sanction in Code § 16.1-253.2 applies. Once Mr. Claramunt appeared before the court, received the PPO, and understood its terms, the PPO became the controlling and prosecutable order, thereby superseding the EPO.

The plurality also looks beyond the four corners of the PPO, in contravention of this Court's binding precedent, though it concedes Mr. Claramunt's presence before the court and his actual notice. *See supra* at 6 n.4. The PPO's ex parte box is unchecked, which under *McBride v.*

- 30 -

*Commonwealth*, 24 Va. App. 30, 32-33, 35-36 (1997), is presumed to "correctly represent" the court's "legal judgment." This Court has treated standardized forms as reliable evidence of judicial intent absent any contradictory indication in the issuing court's record. *See id.* at 35 ("If we presume that the district court judge in the prior case lawfully discharged his duties, then his failure to indicate on the warrant that he found appellant guilty . . . *correctly represents his judgment*." (emphasis added)); *see also Epps v. Commonwealth*, 66 Va. App. 393, 401 (2016) ("A court speaks through its orders and those orders are presumed to accurately reflect what transpired." (quoting *McBride*, 24 Va. App. at 35)). This Court has never held that testimony from a witness in a later proceeding may amend or alter a prior court order, a principle consistent with our decision in *McBride*.

The unchecked ex parte box, therefore, conclusively establishes, for purposes of this appeal, that the JDR court found both parties appeared and submitted to its jurisdiction regarding the PPO—precisely the circumstance in which a PPO becomes effective even without formal service. The same judge who issued Ms. Claramunt's PPO less than an hour earlier checked the ex parte box on the reciprocal PPO issued for Mr. Claramunt, confirming a deliberate choice to leave the box unchecked on the earlier order. The plurality nonetheless relies on evidence from the later circuit court trial record to imply that the judge erred.[23] That approach—using witness testimony from a subsequent proceeding to alter the meaning of a prior court order—is difficult to reconcile with this Court's longstanding precedent. As *McBride* makes clear, the failure to check a box on a judicial form is presumed to "correctly represent[]" the judge's "legal

---

[23] The plurality's attempt to distinguish between "not relying on" testimony and "explaining why testimony cannot be relied upon" is a distinction without a difference—both approaches improperly discount the unchecked ex parte box's presumptive legal effect under *McBride*.

- 31 -

judgment," and accepting that the judge "merely neglected to complete the printed form" requires speculation that "the district court judge made no other errors." 24 Va. App. at 35-36.

The plurality's concession that "Claramunt was present and had actual notice" is dispositive. *Supra* at 6 n.4. As the plurality acknowledged Mr. Claramunt's presence before the court and actual notice of the PPO, it follows that the PPO became operative to Mr. Claramunt. The plurality cannot simultaneously accept the presence and actual notice findings while rejecting legal effectiveness.

## VI. The Attorney General's Opinion and VCIN Mechanics

The concurrence relies on a 2019 Attorney General opinion, 2019 Op. Va. Att'y Gen. 141, to suggest that multiple protective orders addressing the same parties and subject matter may coexist and remain independently enforceable. But that Attorney General opinion answers a different question: when law-enforcement agencies may remove protective orders from the Virginia Criminal Information Network (VCIN). It concludes that an agency "should not remove a protective order from [VCIN] unless it receives a court order of dissolution or the protective order has expired by its own terms or by operation of law," and observes that "where more than one active protective order exists involving the same parties, an individual may be charged with violating a discrete provision of either order." *Id.* at 141, 143.

Three points reveal that the Attorney General opinion is inapplicable here.[24] First, it addresses administrative database maintenance, not the legal question of which order governs for purposes of criminal prosecution when a judge has issued a subsequent protective order and interpreted its controlling effect in the respondent's presence. Second, the Attorney General

---

[24] The concurrence also invokes *Beck v. Shelton*, 267 Va. 482, 492 (2004), to argue that the General Assembly's six-year silence after the issuance of the Attorney General opinion "evinces legislative acquiescence." However, *Beck's* holding applies only when an Attorney General opinion addresses the precise statutory question at issue, which is not the case here.

opinion's reference to multiple "active" orders assumes no judicial supersession; it does not address a situation where a subsequent PPO covers the same subject matter, imposes new conflicting terms, and is treated by the issuing court as displacing the earlier EPO. Third, the Attorney General opinion itself recognizes that orders may terminate "by operation of law." That principle applies in this case; once the court issued the PPO, noted Mr. Claramunt's appearance, and explained its terms, the EPO's practical and legal authority was exhausted by operation of the statutory sequence and judicial action.

Additionally, the VCIN subsection of the PPO statute does not alter the legal effect of the PPO. Code § 16.1-253.1(B) directs that the court "shall forthwith" enter identifying information into VCIN upon issuing a PPO and that law enforcement shall "forthwith" serve the order and update VCIN upon service, dissolution, or modification. These provisions ensure accurate, real-time communication for officers in the field. They do not dictate when, as a matter of due process, an order becomes effective against a respondent who has already appeared before the issuing court and received the order. VCIN is an administrative communications tool, not a determinant of when a protective order becomes legally operative against a particular respondent.

VII. Absurd and Unworkable Consequences

While statutory language guides our interpretation, "we will not interpret a statute in a way that leads to unreasonable or absurd results." *Colbert v. Commonwealth*, 47 Va. App. 390, 395 (2006). An "absurd result" is one "that results in the statute being internally inconsistent or otherwise incapable of operation." *Commonwealth v. Delaune*, 302 Va. 644, 655 n.1 (2023) (quoting *City of Charlottesville v. Payne*, 299 Va. 515, 532 (2021)). The plurality's and concurrence's readings produce internal inconsistencies of this kind.

Under the plurality's interpretation of the statute, a PPO would not protect victims until formal service is carried out by law enforcement, even if respondents have actual knowledge and have appeared before the issuing court. This leads to the absurd result that a respondent who knows about a PPO but has not yet been served could violate its terms despite actual notice, under the assumption that the order is not yet legally effective. This incentivizes evasion of service and frustrates the statute's protective purpose.

Protection gaps would also arise if an EPO expired before PPO service occurs; during this window, no enforceable protection would exist despite the court's issuance of a valid protective order and the respondent's knowledge of it. Reading the protective-order statutes to expose a respondent to criminal liability under simultaneous, contradictory orders also amounts to an impermissible expansion of penal statutes by implication, an approach the Supreme Court has rejected. *Wade*, 202 Va. at 122. All of these outcomes undermine the core statutory purpose of the protective orders: to protect the health and safety of the petitioner and their family members. *See* Code § 16.1-253.1(A).

The plurality's approach further means that respondents who appear before a judge, receive a PPO from the court, and conform their conduct to the judge's guidance may still face criminal prosecution for conduct the court expressly permitted, as occurred here.[25] Such a result raises similar concerns to what this Court has described as "an act of 'intolerable injustice'" as it

---

[25] Although Mr. Claramunt did not preserve a *Miller v. Commonwealth*, 25 Va. App. 727 (1997), defense in the court below, the principles underlying that doctrine illuminate the due process concerns. In *Miller*, this Court established a defense where a defendant "reasonably relied upon affirmative assurances that certain conduct is lawful, when those assurances are given by a public officer or body charged by law with responsibility for defining permissible conduct." *Id.* at 735. Mr. Claramunt received the PPO directly from the JDR court, the body empowered by statute to issue and define protective order scope. The order explicitly permitted "non-hostile contact with the children." His reliance on this judicial directive from the authoritative source illustrates why prosecuting him under the superseded EPO violates fundamental fairness.

holds criminally liable a person who reasonably relied on a judicial instruction that expressly stated the related conduct was lawful. *Davis v. Commonwealth*, 68 Va. App. 725, 733 (2018) (quoting *United States v. Brady*, 710 F. Supp. 290, 295 (D. Colo. 1989)). It risks resembling the "most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him." *Raley v. Ohio*, 360 U.S. 423, 438 (1959).

The concurrence's framework presents related concerns. It asserts that "the respondent will have to comply with the more demanding order until the EPO expires," even when a later PPO, issued by a judge, affirmatively permits conduct the magistrate-issued EPO forbids. Here, the EPO prohibited any contact with the children; the PPO permitted "no *hostile* contact" with them. (Emphasis added). Under the concurrence's view, Mr. Claramunt was obligated to have no contact while simultaneously allowed non-hostile contact. These judicial orders are not simply "more demanding" and "less demanding" variants of the same duty; they are mutually exclusive criminal commands. Even a single day of criminal liability predicated on such contradictory directives raises serious due process concerns. *See Johnson v. United States*, 576 U.S. 591, 595 (2015) (due process requires criminal laws to give "ordinary people fair notice of the conduct [they] punish[]").

The concurrence's suggestion that this problem is "quite limited" because an EPO lasts only three days does not fully account for the systemic reality: EPOs and PPOs are frequently issued, and confusion about their coexistence is precisely the type of recurring issue that can evade review yet cause injustice. That the concurrence ultimately proposes revising the standardized PPO form (Form DC-627) to add a checkbox for "supersede, dissolve, or modify" earlier EPOs underscores that its interpretation requires additional procedural mechanisms not

found in the current statutory scheme.  If the statute already imposed concurrent enforcement, then no form revision would be necessary.

The interpretive uncertainties raised in the concurrence and plurality also create practical vulnerabilities.  A respondent could exploit the period between issuance and formal service of a PPO, even with actual notice, leaving a petitioner unprotected.  Law enforcement and respondents would also face conflicting directives, with no statutory mechanism for determining which order controls.  These results underscore the need for a coherent construction, one that treats judicially-issued PPOs as superseding earlier magistrate EPOs as to inconsistent terms.

CONCLUSION

The law demands clarity and fairness.  Once the JDR court issued the PPO, recorded Mr. Claramunt's appearance, and instructed him regarding permissible conduct, the EPO no longer governed for purposes of criminal enforcement.  The statutory scheme is sequential by design: the court's exercise of judicial authority in entering the PPO superseded the earlier magistrate's emergency order.  Virginia's protective-order statutes are remedial and must be construed to advance safety and provide fair notice, not to create overlapping commands that risk ensnaring individuals in technical violations.

A construction recognizing the PPO as the controlling order once the respondent receives actual notice, respects judicial hierarchy and ensures that protective orders operate as intended, offering meaningful protection and clear guidance rather than conflicting obligations.

For the foregoing reasons, we respectfully dissent and would reverse and dismiss Mr. Claramunt's conviction.

**PUBLISHED**

# *VIRGINIA:*

*In the Court of Appeals of Virginia on* **Tuesday** *the* **13th** *day of* **May, 2025**.

Diego Claramunt,                                                                                              Appellant,

 against            Record No. 1731-23-1
                   Circuit Court No. CR23000384-00

Commonwealth of Virginia,                                                              Appellee.

Upon a Petition for Rehearing En Banc

Before Chief Judge Decker, Judges Beales, O'Brien, AtLee, Malveaux, Athey, Fulton, Ortiz, Causey, Friedman, Chaney, Raphael, Lorish, Callins, White, Frucci and Bernhard

On April 22, 2025, the appellee, by the Attorney General of Virginia, filed a petition requesting that the Court set aside the judgment rendered on April 8, 2025, and grant a rehearing en banc on the issue(s) raised in the petition.

On consideration whereof and pursuant to Rule 5A:35 of the Rules of the Supreme Court of Virginia, the Court grants the petition for rehearing en banc and reinstates the appeal of those issues on the docket.  The Court stays the mandate previously entered in this case pending the Court's en banc decision.

The parties must file briefs in compliance with the schedule set forth in Rule 5A:35(b).

A Copy,

Teste:

A. John Vollino, Clerk

By:    *original order signed by a deputy clerk of the*
       *Court of Appeals of Virginia at the direction*
       *of the Court*

Deputy Clerk

Present:    Judges Causey, Chaney and Callins
Argued by videoconference

PUBLISHED

DIEGO CLARAMUNT

                                                        OPINION BY
v.      Record No. 1731-23-1                JUDGE VERNIDA R. CHANEY
                                                        APRIL 8, 2025

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
Marjorie A. Taylor Arrington, Judge

Kristin Paulding (7 Cities Law, on brief), for appellant.

Rachel A. Glines, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Claramunt challenges his conviction under Code § 16.1-253.2 for violating an emergency

protective order.  He argues that the trial court erroneously concluded that the emergency

protective order remained in effect until its expiration date, even though the court, upon a

hearing, issued a preliminary protective order pursuant to Code § 16.1-253.1.  This Court agrees

and reverses his conviction.

BACKGROUND[1]

Claramunt's wife, Adriane, obtained an emergency protective order from a Chesapeake

magistrate at 11:30 p.m. on May 29, 2022, pursuant to Code § 16.1-253.4.  Claramunt was

served with the emergency protective order on May 30, 2022, at 12:03 a.m.  The emergency

protective order prohibited him from having any contact with his wife or their two children and

---

[1] The facts are stated "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).

granted Adriane exclusive possession of the family home in Chesapeake. The emergency protective order stated that it expired at 11:59 p.m. on June 1, 2022.

Because Adriane "wanted more protection," she obtained a preliminary protective order from the Chesapeake juvenile court at 11:07 a.m. on May 31, 2022, pursuant to Code § 16.1-253.1.[2] The preliminary protective order continued to prohibit Claramunt from contacting his wife or going to the family home but allowed him to have "no hostile contact" with his children. It also directed him to maintain the utilities for the residence and gave possession of a vehicle to Adriane. The order stated that a full hearing would be set for June 15, 2022. The order does not indicate that it was personally served on Claramunt, but he learned of it while at the courthouse to obtain a separate preliminary protective order against Adriane. That order was served on her at 11:50 a.m. on May 31, 2022.

Based on the judge's remarks when Claramunt was in court, he believed he was allowed to contact his children and to remove some of his items from the family home. Claramunt took his son from school[3] and then went to the house where he collected his work uniforms, computer, and CPAP machine. They were in the home for about five or six minutes. Neither Claramunt's wife nor daughter was present.

On June 1, 2022, Adriane initiated a complaint against Claramunt for violating the terms of the protective order, which was in effect as of May 31, 2022, by contacting the children and entering their home. At a hearing held in the juvenile court on February 23, 2023, the court found Claramunt guilty and sentenced him to 10 days in jail, with 9 days suspended. Claramunt appealed to the circuit court, which heard the case on September 22, 2023.

---

[2] The court was closed on May 30, 2022, for a holiday.

[3] Claramunt also went to his daughter's school, but she did not leave with him.

- 2 -

Claramunt argued that, since he was specifically charged with violating the emergency protective order and the preliminary protective order superseded it, he was not guilty of that violation. The Commonwealth contended that the preliminary protective order was not in effect on May 31 because it had not been served on Claramunt. However, Claramunt introduced the preliminary protective order as an exhibit and testified about its contents without objection during the hearing. The trial court determined that the emergency protective order had not yet expired and that it did not allow Claramunt to contact his children or access the family home. The court dismissed Claramunt's argument that a juvenile court judge had orally granted him permission, stating, "a court speaks through its orders." The court found Claramunt guilty and sentenced him to five days in jail with four days suspended.

ANALYSIS

Claramunt raises two issues on appeal. He argues that the trial court erred in finding him guilty of violating the emergency protective order because (1) it was no longer in effect after the preliminary protective order was "entered," and (2) he believed he had permission from the juvenile court judge to contact his children and retrieve his belongings from the family home. Issues of statutory interpretation are reviewed de novo. *Esposito v. Va. State Police*, 74 Va. App. 130, 133 (2022); *Bennett v. Commonwealth*, 60 Va. App. 656, 665 (2012). The "primary objective" of statutory interpretation "is to ascertain and give effect to legislative intent." *Brown v. Commonwealth*, 284 Va. 538, 542 (2012) (quoting *Commonwealth v. Zamani*, 256 Va. 391, 395 (1998)).

I. The emergency protective order became ineffective once the preliminary protective order became effective.

The purpose of an emergency protective order under Code § 16.1-253.4 is to protect the health or safety of a person whom a judge or magistrate finds is in "probable danger" of being harmed by a family member. Code § 16.1-253.4(B). The order temporarily prohibits contact,

including physical presence, between the protected person and the alleged abuser. *Id.* The order allows the protected person exclusive possession of the family residence and possession of any companion animals. *Id.* The order expires at 11:59 p.m. on the third day after it is issued; however, if the court is not in session, it is extended for an additional 24 hours.[4] Code § 16.1-253.4(C). When issuing an emergency protective order, the magistrate or judge gives the protected person a form to file for a preliminary protective order under Code § 16.1-253.1. *See* Code § 16.1-253.4(C).

The preliminary protective order then provides expanded protections to the petitioner. In addition to the restrictions imposed by an emergency protective order, a preliminary protective order has additional conditions regarding utilities, cellular telephones, electronic devices, and vehicles. *See* Code § 16.1-253.1(A)(4), (5), (6). The order sets a date for a full hearing within 15 days, at which a protective order under Code § 16.1-279.1 1, valid for up to two years, may be entered. *See* Code § 16.1-253.1(B). The hearing date may be extended, if necessary, but the preliminary protective order remains in effect until the hearing. *Id.* Either party may request that the court modify or dissolve the preliminary protective order. *Id.*

Read together, the logical interpretation of these two statutes is that the protected person has 72 hours to obtain a preliminary protective order, ensuring there will be no lapse in protection. However, once a preliminary protective order is issued or becomes effective, the

---

[4] When Code § 16.1-253.4 was first enacted, an emergency protective order expired 24 hours after it was issued. 1991 Va. Acts ch. 715. Later amendments changed the expiration date to 72 hours after issuance or the next day court was in session. *See* 1996 Va. Acts ch. 866; 1998 Va. Acts ch. 684. The purpose of an emergency protective order is to provide immediate protection and safety to the petitioner-victim until a hearing can be held, and the General Assembly intended to set a reasonable amount of time to schedule a hearing. However, the fact that an emergency protective order automatically expires after three days does not mean that it can or should coexist with a subsequently issued preliminary protective order that has different terms.

- 4 -

emergency protective order ceases to have legal effect.[5]  Practically speaking, the preliminary protective order expands the emergency protective order by extending its duration and potentially modifying its conditions.  *Cf*. Code § 8.01-624 (stating that when a temporary injunction is granted, the "court shall prescribe in the injunction order the time during which such injunction shall be effective and at the expiration of that time such injunction shall stand dissolved unless, before the expiration thereof, it be enlarged").

Therefore, as correctly understood, emergency protective orders are intended to be effective until the order statutorily expires or until the court, after a hearing, issues a preliminary protective order.[6]  Emergency orders being rendered ineffective by subsequent orders has been observed in other jurisdictions.  *See Fagan v. Commonwealth*, 63 Va. App. 395, 398 (2014)

---

[5] In 2019, the Attorney General issued an opinion stating that where more than one active protection order involving the same parties existed, with the second order having been issued based on a violation of the first order, both should remain in the Virginia Criminal Information Network and in effect until either is modified or dissolved by the court, terminate under operation of law, or expire by their own terms.  2019 Op. Va. Att'y Gen. 141-43, *available at* https://www.oag.state.va.us/files/AnnualReports/AnnualReports2001-Present/2019_Annual_Report.pdf (last accessed Apr. 7, 2025).  Under this interpretation, should the respondent violate a term of either protective order, the individual may be charged with violating a discrete provision of either order, unless such charges violate double jeopardy.  *Id.* at 143 n.9.  This opinion addresses two of the same type of protective order, distinguishable from this case where the appellant was the subject of an emergency protective order and then a subsequent preliminary protective order.  Further, the Attorney General describes a scenario in which "the second order [is] issued based on a violation of the first order," which is not that case here.  *Id.* at 142. Therefore, this Court does not find the Attorney General's opinion applicable to these facts.

[6] Moreover, the notion that emergency and preliminary protective orders could provide overlapping bases for a criminal violation raises due process concerns.  If a defendant receives actual notice of the preliminary protective order, yet the emergency protective order remained in effect, he may well not understand that he could be charged with violating *either* order.  *Cf. Johnson v. United States*, 576 U.S. 591, 595 (2015) (recognizing due process violation when the government deprives a person of "life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes"); *United States v. Batchelder*, 442 U.S. 114, 123 (1979) ("It is a fundamental tenet of due process that '[no] one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.' . . . So too, vague sentencing provisions may pose constitutional questions if they do not state with sufficient clarity the consequences of violating a given criminal statute." (first alteration in original) (citations omitted) (quoting *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939))).

(looking to "persuasive authority from our sister courts" for illustrations of the distinction between parting with property "willingly" as opposed to by "force or threat"). In *State v. Sievers*, 2 N.W.3d 568, 575 (Minn. Ct. App. 2024), the Minnesota Court of Appeals held that an emergency protective order was overwritten when the trial court held a hearing on a preliminary protective order. In the course of a criminal proceeding for third-degree sexual misconduct, child-protection workers obtained an ex parte emergency order barring Sievers's contact with his putative victim. *Id.* at 571. Rejecting Sievers's challenge to the trial court's jurisdiction, the Minnesota Court of Appeals held that an "emergency order is temporary, effective only until the juvenile court holds a protective-care hearing." *Id.* at 575 (citing Minn. R. Juv. Prot. P. 41.01, subd. 1(b) (prohibiting the state from holding a child in emergency protective care for more than 72 hours without a hearing and an order for continued protective care)).

In *Bartsch v. Bartsch*, 636 N.W.2d 3, 10 (Iowa 2001), the Iowa Supreme Court held that a subsequently issued permanent protective order mooted a father's challenge to a temporary protective order. There, the trial court issued a temporary protective order limiting father's contact with his child. *Id.* at 5 (citing Iowa Code § 236.4). The mother then got a permanent protective order that did not cover child custody and visitation. *Id.* at 10. The Iowa Supreme Court rejected father's challenge to the temporary protective order regarding child custody and visitation as moot: "[T]he court entered its permanent order, which did not purport to deal with issues of child support or visitation, and at the point the permanent order was entered, the temporary order became ineffective." *Id.*

In the absence of Virginia authority, the Minnesota and Iowa cases provide useful guidance. The statutory regimes of all three jurisdictions extinguish emergency orders after a limited set of days. All three jurisdictions require court intervention before they can be extended. Finally, none of them explicitly provides for the circumstance when emergency and

more-permanent orders overlap.  We find that these similarities make the authorities of our sister states persuasive.

## II. The preliminary protective order was in effect at the time Claramunt allegedly violated the emergency protective order.

The Commonwealth argues that the preliminary protective order was not in effect on May 31, 2022, because the order presented at trial did not show that Claramunt had been served with it.  Code § 16.1-253.1(C) states that the preliminary protective order "is effective upon personal service on the allegedly abusing person."

First, we note that the text of Code § 16.1-253.1(C) does not mandate that "personal service" is *required* for a preliminary protective order to be effective.  It only specifies that the "preliminary order *is* effective upon service on the allegedly abusing person."  Code § 16.1-253.1(C) (emphasis added).  This is neither a specification that an order is effective *only* upon personal service nor directing service to be made upon an allegedly abusing person.  But the statute *does* direct service to the allegedly abusing person in the context of maintaining the Virginia Criminal Information Network database.  *See* Code § 16.1-253.1(B).  The presence of that command in one subsection and its absence in another is meaningful.  *See, e.g.*, *Zinone v. Lee's Crossing Homeowners Ass'n*, 282 Va. 330, 337 (2011) ("[W]hen the General Assembly has used specific language in one instance but omits language or uses different language when addressing a similar subject elsewhere in the Code, we must presume that the difference in the choice of language was intentional.").

Our decision in *Tsai v. Commonwealth*, 51 Va. App. 659 (2008), is instructive as showing the possibility of the effectiveness of a protective order despite imperfect service.  There, this Court reversed the appellant's conviction of violating a permanent protective order issued under Code § 16.1-279.1.  *Tsai*, 51 Va. App. at 650.  Violating such an order is a Class 1 misdemeanor; however, the statute does not require a specific mens rea for such a conviction.

- 7 -

*See* Code § 16.1-253.2(A). Meanwhile, the statute *does* mandate that a permanent protective order be served on the defendant. *See* 2006 Va. SB 120 § 1 (reenacting then-current Code § 16.1-279.1(B) ("A copy of the protective order *shall be served* on the respondent and provided to the petitioner as soon as possible." (emphasis added))).[7] Still, this Court observed:

> [I]n order to punish a person for contempt for violation of an order, judgment or decree, it must appear that such order, judgment, or degree has been *personally* served on the one charged, or that he has had *actual* notice of the making of such order or rendition of such judgment or decree.

*Tsai*, 51 Va. App. at 654 (quoting *Calamos v. Commonwealth*, 184 Va. 397, 403 (1945)). Even given this, however, this Court reversed the appellant's conviction because service of a protective order upon the appellant's attorney did not qualify as either "personal service" or "actual notice." *See id.* at 655.

Thus, where the defendant does not put the effectiveness of a preliminary protective order in issue, proof of personal service is not necessary to establish the legal operation of that protective order. *Cf.* Code § 8.01-288 ("Except for process commencing actions for divorce or annulment of marriage or other actions wherein service of process is specifically prescribed by statute, process which has reached the person to whom it is directed within the time prescribed by law, if any, shall be sufficient although not served or accepted as provided in this chapter."). *Personal Service (1), Black's Law Dictionary* 1381 (11th ed. 2019) ("Actual delivery of the notice or process to the person to whom it is directed – Also termed *actual service*."). *Contra Tsai*, 51 Va. App. at 651 ("Appellant moved to strike the evidence on the ground that the Commonwealth failed to prove she had knowledge of the terms of the protective order.").

---

[7] This is the language of the statute as it existed when this Court decided *Tsai*. The service requirement then in Code § 16.1-279.1(B) is largely retained in present Code § 16.1-279.1(C).

We do not hold that Code § 8.01-288 is applicable to all domestic relations matters or governs service of process in all matters outside Title 8.01 of the Virginia Code. Still, when combined with this Court's pronouncement in *Tsai*, we consider Code § 8.01-288 informative for the proposition that there are instances, as here, where imperfect or a strong inference of service of process can establish the legal operation of preliminary protective orders. While this case arises under the juvenile court's jurisdiction as set forth in Title 16.1, nothing in the text of Code § 8.01-288 restricts its operation to cases arising from the circuit court's general jurisdiction.[8]

Therefore, this Court finds, under these facts, that Claramunt had actual notice of the terms of the preliminary protective order and that its service upon him was effective. Claramunt himself introduced the preliminary protective order into evidence, and it was admitted without objection. At trial, Claramunt testified that he was aware of the order when he was in court seeking the preliminary protective order against Adriane and asked a judge for clarification of its terms.[9] He introduced the permanent protective order as an exhibit. Claramunt's son testified that his father told him the new preliminary protective order replaced the emergency protective order. As such, here, (1) the preliminary protective order was admitted into evidence as a

---

[8] We also note that, under Titles 8.01 and 16.1, juvenile and circuit courts have concurrent jurisdiction over many disputes. *See generally* Code §§ 16.1-241, -244 (providing concurrent jurisdiction between JDR courts and circuit courts in certain instances, as well as an appeal process from JDR to the circuit court). In making this observation, we do not pass upon the jurisdictional relationship between circuit courts and courts not of record.

[9] We recognize that the judge's statements concerning the operational effect of the preliminary protective order may not have been admissible for the truth of the matter asserted. That is, the judge's comments may not have been competent to establish the legal effect of the order itself. But those statements would nevertheless have been admissible to establish Claramunt's knowledge of the order or his *subjective belief* as to its operability. *See Jones v. Commonwealth*, 71 Va. App. 597, 604 (2020) ("If a statement is offered for any purpose other than to prove the truth or falsity of the contents of the statement, such as to explain the declarant's conduct or that of the person to whom it was made, it is not objectionable as hearsay." (quoting *Hamm v. Commonwealth*, 16 Va. App. 150, 156 (1993))). At the hearing, Claramunt's counsel explained that the judge's statements were not being offered for the truth of the matter asserted.

defense exhibit, (2) Claramunt testified that he obtained the preliminary protective order while at court, and (3) he testified about its contents at the hearing. On these facts, we are satisfied that the preliminary protective order was properly served upon Claramunt and was in effect at the time Claramunt allegedly violated the emergency protective order.

Claramunt was charged specifically with violating the emergency protective order. However, he could not be guilty of that charge because the emergency protective order was not enforceable once the preliminary protective order took effect, and there was no evidence he violated the emergency protective order before the preliminary protective order superseded it.[10] In *Souter v. Irby*, 593 F. Supp. 3d 270 (E.D. Va. 2022), a tenant obtained an emergency protective order under Code § 19.2-152.8 against her landlord, who then cut off her utilities. The warrant for his arrest incorrectly charged a violation of Code § 16.1-253.4. Because that statute was not related to the emergency protective order, the police erred in arresting the landlord. Similarly, here, the trial court erred in finding Claramunt guilty of violating the emergency protective order.

Because we hold that the trial court erred in finding Claramunt guilty, we need not address his second argument that he believed he could enter the home after speaking with the court. *See Carter v. Commonwealth*, 79 Va. App. 329, 349 n.9 (2023) ("Virginia appellate courts 'strive to decide cases on the "best and narrowest grounds available."'" (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010))).

---

[10] Appellant's counsel candidly admitted at oral argument that Claramunt had violated the preliminary protective order by going to the family house but argued he had not been charged with violating the preliminary protective order.

CONCLUSION

For these reasons, the conviction is reversed.

*Reversed and dismissed.*